IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANGELO LEHN,

    Plaintiff,

v.

RICHARD REED, et al.,

    Defendants.

OPINION AND ORDER

Case No. 17-cv-435-wmc

This court previously granted *pro se* plaintiff Angelo Lehn leave to proceed in this lawsuit under 42 U.S.C. § 1983. (Dkt. #13.) In particular, the court allowed Lehn to proceed against defendants on claims that they failed to protect Lehn from the assault of another prisoner in violation of his Eighth Amendment rights, then failed to take appropriate measures after the attack to ensure he was not attacked again. Pending before the court is defendants' motion for summary judgment (dkt. #34), which the court will grant for the reasons set forth below.[1]

UNDISPUTED FACTS[2]

A. Parties and Housing Structure

Plaintiff Angelo Lehn was incarcerated at Stanley Correctional Institution ("Stanley"), in 2017, when the events giving rise to his claims occurred. The defendants

---

[1] Lehn has also filed a motion requesting an attorney and a motion seeking a trial date on or after September 24, 2021. (Dkt. ##72, 75.) Because Lehn filed a substantive response to defendants' motion for summary judgment, and a trial is unnecessary, both motions will be denied as moot.

[2] For the most part, the court has drawn the following material facts from defendants' proposed findings of fact, plaintiff Lehn's opposition to defendants' motion, and his verified complaint.

were all Wisconsin Department of Corrections ("DOC") employees at that time, including Stanley's Warden Reed Richardson, Deputy Warden Mario Canziani, Unit Supervisor Hillary Brown, and Correctional Officer ("CO") Tina Okerglicki.

Stanley is a medium security institution divided into five general population units. Prisoners at Stanely are assigned to a unit based on: security considerations; the availability of space on the other housing units; Prison Rape Elimination Act ("PREA") considerations; and their health, work, programming and clinical needs. Once assigned to a unit, the Unit Wing Correctional Officers, Unit Managers and Unit Sergeants handle cell assignment and management, with the unit managers being the primary decision-makers.[3]

During the relevant time, Stanley's Deputy Warden did not participate in unit or cell assignments, nor did the Deputy Warden receive or handle any Special Placement Need ("SPN") requests. Those requests, along with other communications and requests

---

Specifically, plaintiff did not formally respond to defendants' proposed findings of fact, but instead filed an opposition that refers to allegations from his verified complaint and asks that the court review other documents and affidavits submitted in this case. Although the court grants plaintiff leniency considering his *pro se* status, it is not obligated to scour the record to develop plaintiff's opposition. *Jeffers v. Commn'r*, 922 F.3d 649, 653 (7th Cir. 2021). Plaintiff also submits a list of questions he would ask CO Okerglicki, including asking about Unit Supervisor Brown's alleged concession that she handled the situation incorrectly. However, his proposed questions of Okerglicki are not evidence. That said, given that plaintiff verified the allegations in his complaint and would be able to testify about certain, other assertions made in his opposition brief, the court has considered that information in resolving defendants' motion. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (a verified complaint "is also the equivalent of an affidavit for purposes of summary judgment); *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) ("To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible.").

[3] Due to population constraints, Stanley did not make single cell assignments during the relevant period.

related to threats, are instead forwarded to Stanley's Security Director. In 2017, Stanley's Security Director was a non-defendant, J. Achterberg.

### B.  SPN Requests, Prisoner Grievances, and Correspondence Protocols

The procedures governing SPN requests are set forth in DAI Policy #306.00.23. Once an inmate initiates the SPN process by filling out form DOC-1803, that policy directs the Security Director to designate a staff member to investigate. The staff member is expected to review the SPN request, make appropriate inquiries and recommend whether an SPN is warranted. If the staff member recommends granting the request, the Security Director (or his or her designee) reviews that recommendation. If approved at that level, the SPN is documented in the prison computer system, and the prisoner is referred to the Classification Specialist employed by the Bureau of Classification and Movement ("BOCM") for possible transfer of one or both inmates involved out of Stanley. The Warden and Deputy Warden are also often informed of serious incidents and related, significant investigations that require approval of a SPN request.

Although Stanley's Security Director handles communications related to SPN requests, threats or concerns about inmate safety, the Institution Complaint Examiner ("ICE") handles inmate grievances and complaint correspondence from inmates directed to Stanley's Warden or Deputy Warden, including a challenge to approval or denial of an SPN request. The ICE also investigates the allegations made in those communications, with the Warden and Deputy Warden getting involved only when further review is needed to sign off on the investigation as the reviewing authority after the ICE completes an investigation. Additionally, general correspondence directed to the Warden and Deputy

3

Warden is initially reviewed by their assistants or secretaries, who are responsible for researching, redirecting, and drafting responses for review and signing by the Warden and Deputy Warden. Finally, when a prisoner has a problem that a Unit Wing Officer cannot handle, the prisoner is required to submit an "Information/Interview Request" form and follow up through the chain of command set forth in the Inmate Handbook.

### C. Lehn's Communications Before the Assault

In January 2017, Lehn was housed in Unit 4 at Stanley. Defendant Brown was that Unit's Supervisor at the time. Lehn alleges in his complaint that in January 2017 (he does not specify the exact date), he spoke directly to defendant Brown about his being threatened by another prisoner named J. Franklin, who was a member of a prison gang named the Royals. Concerned for his safety, Lehn then asked to be moved from Unit 4. Lehn claims that defendant CO Okerglicki was also present for this conversation. At the same time, Lehn reports sending letters to Warden Richardson and Deputy Warden Canziani, writing that there were members of a prison gang who referred to him as an "informer" and had "put a hit out" on him. Lehn does not allege when he wrote those letters, nor that he mentioned Franklin specifically in any of those letters, but he does claim that *no* action was taken to remove Franklin or him from the unit.

In stark contrast, Brown attests that Lehn *never* reported to her that another prisoner named Franklin had threatened him. Moreover, it is undisputed that Lehn did *not* submit a DOC-1803 form requesting an SPN because Franklin had threatened him. For his part, CO Okerglicki does not recall Lehn reporting a threat to Brown or providing a DOC-1803. More broadly, Okerglicki does not even recall Lehn asking to be moved to another cell; in

4

any event, she attests to lacking the authority to move Lehn to a different cell or institution herself.

On January 26, 2017, Lehn did meet with the Reclassification Committee, which included Unit Supervisor Brown, for his Program Review Committee ("PRC") hearing. During that hearing, Lehn informed the committee that he wanted to be transferred out of Stanley because he was having issues with a Security Threat Group ("STG"), a term the DOC uses to classify gangs, because he had served as an informant against members of that group. Unit Supervisor Brown also did not recall Lehn reporting during the hearing that Franklin was threatening him, and Lehn apparently had not submitted an SPN request in advance, as required by DAI policy 306.00.23. However, the Reclassification Committee did not advise Lehn to submit an SPN request, and Brown explains that if Lehn had reported a *specific* threat from another prisoner, the committee would have advised him to submit such a request. Regardless, following the hearing, the reclassification committee denied Lehn's request for a transfer to another institution, explaining instead that: "no significant justification to support this considering time remaining to serve and lengthy transfer/program wait lists. Retention at [Stanley] is recommended based on bed space management needs and program availability." (Brown Decl. (dkt. #39) ¶ 15.)

On February 6, 2017, Lehn next requested a meeting with a non-defendant, Stanley Sergeant Raj Walia. Lehn, Walia and Unit Supervisor Brown then met, and the conversation was documented in informational Incident Report ("IR") 0255712, which Walia prepared. Moreover, at this time, Lehn was indeed acting as an informant, having been confirmed a Latin King with "Aid and Assist," meaning that Lehn had sworn to join

5

in the defense of his fellow Latin King members. In fact, Lehn told Brown and Walia that *he* had been ordered to physically assault prisoner Franklin (believed to be prisoner Joshua Franklin), but declined to carry out that order. Lehn further advised that two days later he noticed Franklin had a black eye. Lehn also reported rising tensions between the Latin Kings and other STGs at Stanley. Even so, Lehn did *not* report, during that meeting at least, that Franklin was threatening him, nor did he ask to be separated from Franklin. Nevertheless, Brown searched the Wisconsin Integrated Corrections System ("WICS") database to determine whether Franklin had any known, STG affiliations. Her search indicated that he had none.

After the meeting on February 8, Lehn directed an Interview/Information Request to "Security," asking to be transferred to another prison for safety issues, specifically writing, "Inmate Franklin who says he plans to assault me when he sees me again and also a gang here is after me because they figured out I was helping [Unit Supervisor] Brown and Sgt. Walia." (Ex. 1005 (dkt. #40-5) 2.) Even so, Brown, Richardson and Canziani each attest that they did not receive, review or know about this request form, and no evidence of record contradicts their averments.

### D. Assault on Lehn and Subsequent Complaints About his Safety

On February 16, 2017, Lehn was physically assaulted by prisoner Franklin and suffered injuries to his face, neck, back, kidney and ribs. Unit Supervisor Brown learned about the fight after it happened, while CO Okerglicki claims not to even recall the fight, although acknowledging that she may have been involved in handcuffing or escorting Lehn to restrictive housing or the health services unit after their fight. Moreover, Lehn states

6

that after the fight, he was being escorted by CO Okerglicki, and when they passed by, Unit Supervisor Brown admitted that she should have listened to him and apologized. However, Brown does not recall telling Lehn *or* Okerglicki that she had incorrectly or insufficiently addressed his issues with Franklin, and Okerglicki similarly cannot remember Brown saying as much to Lehn or her.

Stanley Deputy Warden Canziani first learned about the problems between Lehn and Franklin on February 23, 2017, after the assault, when Lehn wrote him a letter regarding his safety concerns. On February 24, 2017, Deputy Warden Canziani responded by directing Lehn to contact Stanley's Security Director for that issue, which would have been consistent with the requirement that prisoners follow the appropriate chain of command with respect to safety-related issues.

On February 26, 2017, Lehn was placed on temporary lock-up status in restrictive housing after reporting that he had been threatened with a homemade weapon. However, a staff investigation determined that Lehn fabricated the allegations, and that Lehn had clearly been in possession of the weapon the whole time. Lehn was then charged in a conduct report and found guilty of lying and possession of a manufactured weapon.

On February 28, 2017, Lehn wrote a follow-up letter to the Security Director, again asking to be moved to a different institution, prompting another SPN investigation. That same day, the ICE wrote to Lehn that the concerns he raised in his *February 23* letter were under investigation. During the SPN investigation, Franklin was also interviewed, but reported that *Lehn* was telling other inmates that he gave Franklin the black eye, and that the morning of the incident, Lehn called him a "Pussy" and said Franklin would be his

7

"bitch" in front of another prisoner. (Ex. 1011 (dkt. #39-5) 2.) At that point, Franklin felt he had no choice but to defend his name.

On March 1, 2017, Security Director Achterberg denied Lehn's transfer request, writing that after investigation, staff concluded Lehn's request did not meet the criteria for an SPN. Consistent with this, Security Director Achterberg wrote Lehn a letter on March 7, stating in particular about his request for a transfer:

> Upon my investigation of this matter; I found that UM Brown has discussed this issue with you and even discussed moving you off of Unit 4 when IM Franklin releases from Restrictive Housing and it has been told that you are the one that is talking about the situation at hand and that is how other inmates are finding out about it.

(Ex. 1017 (dkt. #39-11).)

On March 6, 2017, Lehn proceeded to file Complaint No. SCI-2017-6374, regarding that denial. However, the ICE recommended that this complaint also be denied because Lehn's request did not meet the criteria for an SPN outlined in DAI Policy 306.00.23. As the Reviewing Authority, Richardson reviewed the complaint and agreed with this dismissal recommendation. Moreover, Brown attests that she would have deferred to the Security Director's decision in declining to transfer Lehn to another unit. In any event, Brown attests that after this incident, Lehn and Franklin were never on the same unit in general population at the same time, so there was no need to move Lehn.

Specifically, after the altercation, Lehn was returned to Unit 1 on February 21, and he remained there until February 26, when he was moved to restrictive housing. Lehn returned to general population in April 2017, when he was placed in Unit 2, apparently

8

after Brown and Lehn discussed him moving to a different unit. Franklin did not return to Unit 4 until March 22, 2017.

After Lehn returned to Unit 2, he submitted two more SPNs, both of which were denied, and neither of which raised concerns about Franklin specifically. Lehn also submitted four more inmate complaints, raising concerns about his safety. In particular, on March 22, 2017, Lehn filed SCI-2017-7913, alleging that Unit Supervisor Brown was still not addressing his safety concerns and request to move from his cell. The ICE also recommended dismissal of that complaint because the housing location is an administrative decision involving several factors, and because no violation occurred. As the Reviewing Authority, Warden Richardson agreed and dismissed the complaint on March 30 as well, reasoning that moving Lehn was not necessary or supported. Although Lehn appealed the dismissal, the Corrections Complaint Examiner ("CCE") recommended that the appeal be dismissed, writing that Lehn was encouraged to work with staff and security about safety issues and that the institution's response was reasonable. Finally, on April 25, 2017, the Office of the Secretary dismissed the appeal.[4]

On July 17, 2017, Lehn next filed SCI-2017-17964, regarding his safety. That day, the ICE recommended dismissal because there were no incident reports in which Lehn expressed safety concerns. On July 19, Warden Richardson agreed with this recommendation because Lehn had not submitted an SPN regarding fears about his safety,

---

[4] Brown also reviewed Lehn's allegations in SCI-2017-7913 and recalls speaking with Lehn about his concern that other prisoners knew he was providing information to her and Walia. However, Brown does not recall whether the conversations took place before or after Lehn's fight with Franklin; and she does recall that she advised Lehn to stop talking about his activities as an informant.

9

*and* there was no documentation suggesting Lehn was being harassed or threatened. Therefore, Richardson dismissed the complaint and recommended that Lehn work with staff and contact appropriate staff if he has a psychological concern. Accordingly, Lehn's appeal was dismissed.

On July 31, 2017, the ICE rejected yet another complaint that Lehn filed because his concern had been addressed in a prior complaint. On August 9, 2017, Lehn also filed SCI-2017-20151, regarding complaints about Stanley staff targeting him after he filed a lawsuit. However, the ICE recommended dismissal of the complaint that same day, noting that his earlier SPN requests were investigated and denied due to lack of information suggesting he was in danger or had been threatened, and there was no record or knowledge of a lawsuit. Richardson agreed with the recommendation and dismissed the complaint on August 21, after which Lehn's appeal was dismissed as well.

OPINION

Defendants seek summary judgment on plaintiff's Eighth Amendment failure to protect claims, both on the merits and on qualified immunity grounds. Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, all reasonable inferences must be drawn in favor of plaintiff as the nonmoving party. *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). To avoid summary judgment, plaintiff must marshal enough evidence -- not merely a scintilla -- to permit a reasonable jury to rule

in his favor. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998) (internal citations omitted). Since defendants are entitled to summary judgment on the merits of plaintiff's claims, the court limits its analysis accordingly.

I. **Eight Amendment claims**

The Eighth Amendment requires that prison officials take reasonable measures to guarantee inmate safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An Eighth Amendment failure to protect claim has objective and subjective components: (1) the prisoner faced a "substantial risk of serious harm"; and (2) the identified prison officials acted with "deliberate indifference" to that risk. *Id.* at 834; *Brown v. Budz*, 398 F.3d 904, 909, 913 (7th Cir. 2005); *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004).

Critical to plaintiff's claims, the subjective prong "requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). "[A] prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Id.* at 480 (citations omitted). In addition to that knowledge, the official will only be held liable if he disregards that risk by failing to take reasonable measures to prevent it. *Farmer*, 511 U.S. at 847.

11

### A.     Defendants Richardson and Canziani

As an initial matter, Warden Richardson and Deputy Warden Canziani are entitled to summary judgment because no reasonable fact finder could conclude that either had subjective knowledge that Franklin posed a threat to plaintiff's safety before or after Franklin's and Lehn's altercation on February 16, 2017.  First, both defendants attest without contradiction that they first learned about Lehn's concerns with his safety *after* Franklin assaulted Lehn, and plaintiff has not submitted evidence creating a genuine dispute about their knowledge.  Instead, plaintiff points to the letter that he claims was submitted to Richardson and Canziani, apparently at the time he spoke with Brown about Franklin's threat in January of 2017.  However, plaintiff has *no* evidence of when he submitted those letters, what he specifically wrote in them, and whether he received a response.

Second, Richardson and Canziani each attest that they did not receive such a letter, and further that it was their practice to delegate the review of correspondence from prisoners to other staff members.  Moreover, in their capacities as Warden and Deputy Warden, they were entitled delegate such ministerial tasks.  *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.").  Although they further point out that the proper action for plaintiff to take would have been to follow the chain of command, the material question with respect to these defendants is their *actual* knowledge about the threat plaintiff was facing, not whether plaintiff followed protocol.  Ultimately, however, even that argument is of no moment; since plaintiff has submitted *no* other evidence suggesting that either

12

defendant Richardson or Canziani (or the individuals who handle their correspondence) were aware of Lehn's concerns about Franklin or general threats to his safety. Therefore, these defendants cannot be held liable for failing to take steps to separate Franklin and plaintiff before the attack.

Finally, to the extent that plaintiff would fault these defendants for failure to take steps to protect him *after* the February 16, 2017, fight, Deputy Warden Canziani was not involved in Lehn's subsequent complaints about his safety, so he cannot be held personally liable for Lehn's claim that staff subsequently mishandled his concerns. And while Warden Richardson would have been involved in reviewing Lehn's inmate complaints as the last in the chain of command, no evidence of record suggests that he was ever personally aware that Lehn faced a risk of serious harm, much less that he responded with deliberate indifference. To the contrary, Lehn's subsequent inmate complaints raised *no* specific concerns with Franklin or another prisoner threatening him. Rather, by that point, Lehn was complaining about how *Unit Supervisor Brown* was handling his safety concerns. In any event, Lehn's allegations in his inmate complaints remained general, and the ICE that investigated Lehn's allegations did not conclude that his safety concerns were being ignored. Therefore, the record does not support a reasonable finding that when Richardson was personally involved in dismissing his later inmate complaints, he was personally aware of and disregarded an actual threat to Lehn's safety.

13

### B. Defendant Brown

Defendants seek summary judgment as to Unit Supervisor Brown on the grounds that she lacked subjective knowledge that Franklin was threatening plaintiff, and in any event, her response does not support a reasonable inference that she consciously disregarded the risk of substantial harm. In opposition, plaintiff maintains that he *did* report to Brown that Franklin was threatening him in January 2017 and asked to be moved from Brown's unit. Even accepting plaintiff's assertion as true, however, Brown is entitled to summary judgment.

A complaint that identifies a "specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas*, 798 F.3d at 481 (citing *Haley v. Gross*, 86 F.3d 630, 643 (7th Cir. 1996) (prisoner advised sergeant that cellmate was intimidating him, acting strangely, had threatened that "something crucial was going to happen" if one of them was not moved and was "deadlocked" in cell, provided sufficient information to prison official)). On the other hand, "[c]omplaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas*, 798 F.3d at 480-81; *see also Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was threatening him or what threats were); *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (prisoner told officials "he was afraid and wanted to be moved," but "did not tell the officers who assaulted him, why he

14

had been assaulted . . . or whether he continued to feel threatened by assaulting individuals"). Here, at most, plaintiff's description of his January 2017 interaction with Brown and Okerglicki falls into the latter type of complaint, and their subsequent interactions suggest that any risk plaintiff reported had been abated.

Indeed, plaintiff's single allegation from his complaint that he had a conversation with Unit Supervisor Brown about Franklin in January of 2017 is vague and lacking in detail, alleging that he told Brown that Franklin "threatened" him. However, plaintiff does *not* state when that conversation took place, nor does he allege exactly what he reported to Brown. This lack of specificity is a problem when considered in context with the fact that the assault did not actually occur for over two weeks after this alleged conversation at the earliest, and there were two intervening events that undermine the legitimacy of the threat Franklin posed. *See Sinn v. Lemmon*, 911 F.3d 412 (7th Cir. 2018) (defendant's subjective awareness "includes the inmate's complaints along with any other information that defendant may have") (citation omitted).

To start, during the January 26, 2017, PRC hearing, during which Brown was present, plaintiff had the opportunity to describe specifically the threats Franklin had lodged against him, but for reasons that remain unclear, he declined to do so. Instead, plaintiff opted for a vague reference to general concerns about an STG because of his activities as an informant. On February 8, plaintiff again reports speaking with Brown about STGs and his activities as an informant, but he did *not* report that Franklin had threatened him nor that his concerns from January remained. If anything, plaintiff reported that *he* had been directed to assault Franklin and declined to do so. This

15

information was consistent with other reports that plaintiff, a member of the Latin Kings, posed a threat to Franklin, rather than the opposite. In any event, Unit Supervisor Brown specifically talked to Lehn about the information he was providing, and Lehn made *no* mention of any continuing fear that having provided information would cause Franklin (or any other prisoners) to threaten him. Thus, it would be unreasonable to conclude that Brown was subjectively aware Franklin posed an imminent threat to plaintiff's safety, such that her intervention was necessary to avoid serious harm.

Further, the Seventh Circuit would appear to agree that the onus is on the prisoner to detail a specific threat before creating a duty to defend. For example, in *Dale v. Poston,* 548 F.3d 563, 570 (7th Cir.2008), the Seventh Circuit addressed somewhat similar circumstances: a prisoner informed officials that other prisoners were "pressuring" him and asking him questions, but when prison officials followed up by asking if he wanted protective placement, the prisoner declined, and instead asked for a transfer to another prison. *Id.* at 566-67. The Seventh Circuit agreed that on these limited facts, prison officials could not be found to have had subjective knowledge of risk to a prisoner where they followed up by seeking more information, but the prisoner did not provide any, noting in particular that "We cannot emphasize enough the prisoner's responsibility to furnish information in these situations[.]" *Id.* at 570. Although the record here does not suggest that Brown pressed plaintiff for more information when he raised concerns about an STG and his activities as an informant, the result is the same: plaintiff was in the best position to relay his specific concerns about Franklin, and he declined to do so on at least two occasions.

16

Moreover, although plaintiff also submitted an Interview/Information Request on February 8, stating that Franklin was threatening him, Unit Supervisor Brown attests that she did not actually receive or review this request, and plaintiff has submitted no evidence from which a reasonable jury could infer to the contrary. As such, while Brown *may* have had sufficient information to suspect trouble was brewing between plaintiff and Franklin, the most up-to-date information available to Brown was plaintiff's *own* statement that he had been tasked with attacking Franklin, not the other way around, and that Lehn declined to do so. Since plaintiff has not paired this information with any suggestion that Franklin was threatening him, it would be unreasonable to infer Brown was aware that Franklin posed an actual risk of substantial harm to plaintiff at that time.

In fairness, Brown's alleged concession to Lehn that she should have separated him from Franklin before their February altercation suggests that she may have had some awareness Lehn might be attacked. However, even this expression of regret does not support a reasonable inference of deliberate indifference to a substantial risk of harm. At worst, in apologizing to plaintiff, Brown conceded her exercise of poor judgment in failing to press plaintiff for more information supporting his requested transfer, and when viewed in hindsight, she understandably regretted not taking more proactive steps to investigate plaintiff's general complaints. Yet, regret in hindsight is *not* evidence that she was aware of plaintiff's substantial risk of harm, nor that she consciously disregarded that risk. *See Lewis v. Richard*, 107 F.3d 549, 554 (7th Cir. 1997) ("Exercising poor judgment, however, falls short of meeting the standard of consciously disregarding a known risk to his safety."); *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 1996) ("'[C]onduct that simply amounts

17

to mere negligence or inadvertence is insufficient to justify the imposition of liability.'") (quoting *Watts v. Laurent*, 774 F.2d 168, 172 (7th Cir. 1985)). More specifically, on this record, *no* evidence suggests that Brown knew (or reasonably should have known) that on January 26 plaintiff failed to provide the PRC all the relevant information supporting his request for a transfer, nor that on February 6, Brown should have ferreted out of plaintiff whether Franklin was threatening him. Accordingly, Brown cannot be liable for acting with deliberate indifference to the threat that Franklin might attack him before the February 16 attack.[5]

Nor could a reasonable fact-finder conclude that Brown's handling of plaintiff's requests, to be moved after the reported attack amounted to deliberate indifference. Critically, after Franklin assaulted plaintiff, the record shows Brown took steps as Unit Supervisor to make sure that plaintiff was *not* subsequently housed in the same unit as Franklin. Nor does plaintiff dispute that: (1) while he as in restrictive housing, Brown and he discussed moving him to Unit 2; and (2) at no point after February 16 were Franklin and he in the same general population unit.

Finally, although plaintiff subsequently requested an SPN three times and lodged multiple complaints against Brown for her handling of his safety concerns, none raised a credible risk that Franklin *would* attack him again, and the record does not otherwise

---

[5] Defendants also argue that Brown did not just ignore plaintiff's general concerns about his safety, but at some point, discouraged plaintiff from talking about being an informant. However, Brown does not recall when she had this conversation with plaintiff and the advice itself was not unreasonable since plaintiff's continuing to talk to people generally about being infamous may have amounted to wise counsel and certainly not to deliberate indifference. Regardless, this evidence does not assist the court's evaluation of Brown's subjective knowledge before or after the assault on plaintiff.

support a finding that Brown was aware that plaintiff faced a serious risk of assault. Even plaintiff's February 28, 2017, letter to Security Director Achterberg, which prompted an SPN investigation, concluded with a determination that plaintiff's circumstances did not warrant an SPN, noting in particular that *plaintiff* was the one talking about acting as an informant, and Brown had discussed moving him to another unit. Indeed, at that point, Brown was not the decisionmaker with respect to responding to this SPN, and she was entitled to defer to Achterberg's decision to deny it. In any event, neither Achterberg nor Brown saw reason to credit plaintiff's belief that Franklin posed a risk to his safety, and indeed, plaintiff has also failed to come forward with evidence that he reported being subsequently threatened by another inmate, much less that he faced a substantial risk of assault for a second time by Franklin or any other inmate. As such, the denial of plaintiff's SPN simply does not implicate plaintiff's Eighth Amendment rights.

Plaintiff's subsequent SPN requests and inmate complaints were similarly vague, preventing a reasonable jury from inferring any defendant acted with deliberate indifference to real concerns about his safety. As such, no reasonable fact-finder could concluded that Brown was subjectively aware that plaintiff faced an imminent risk of serious harm after the February 16 attack and deliberately chose to ignore or was indifferent to that risk. Therefore, defendant Brown is also entitled to summary judgment in her favor.

## C. Defendant Okerglicki

This leaves Correctional Officer Okerglicki, who is equally entitled to summary judgment. Even assuming, as plaintiff states, that Okerglicki overheard the interaction between Brown and plaintiff in January of 2017, he lacked the authority to separate plaintiff from Brown. In any event, like Brown, the evidence of record does not suggest that Okerglicki had reason to believe that Franklin posed a specific, credible threat to Lehn in February of 2017.[6]

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #34) is GRANTED.

2) Plaintiff Angelo Lehn's motions for an attorney and for a September 24, 2021, trial date (dkt. ##72, 75) are DENIED as moot.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Dated this 22nd day of June, 2022.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge

---

[6] Since defendants are entitled to summary judgment on the merits of plaintiff's claims, the court need not address their qualified immunity argument.